## THE DOWNER.

(District Court, S. D. New York. June 4, 1909.)

Shipping (§ 166*)—Who are "Passengers"—Injury to Licensee.

Personal injury to a ship carpenter employed on the steamer Georgic through falling into a hatch in the after deck of the tug, by the cover giving way, while being taken by her to New York after the completion of his work on the steamer. Held that the libellant could not be deemed a

passenger and he could not recover without showing negligence on the tug's part, which he failed to do.

[Ed. Note.—For other cases, see Shipping, Dec. Dig. § 166.*

For other definitions, see Words and Phrases, vol. 6, pp. 5218–5227; vol. 8, p. 7748.]

(Syllabus by the Judge.)

Warner & Williams, for libellant.
Alexander & Ash, for The Downer.

ADAMS, District Judge. This action was brought by Thomas Carroll, to recover for personal injuries alleged to have been received through the giving way of a manhole cover of a hatch in the after deck of the tug, upon which he stepped, as he was preparing to disembark after being taken, in company with a number of others, as a passenger, on a voyage to Pier 49, Hudson River, from a steamer down the bay. The libel alleges that Carroll was a ship carpenter in the employ of the White Star Line, and in the performance of· his duties, on the 4th day of March, 1908, he was engaged in putting up cattle pens on the steamship Georgic; that the work was not finished when the sailing time of the steamer arrived and those engaged therein continued it until the steamer reached a point near the Narrows; that the White Star Line engaged the tug to follow the steamer down the bay and bring back to said pier the libellant and those working with him. The libel further alleges that when the tug reached her destination, in order to get ashore it became necessary for Carroll to cross the after deck of the tug and in doing so to ·step upon the manhole cover, which was in an unsafe and insecure condition, so that when Carroll stepped upon it, it tilted and he fell into the hatchway, with his right leg in the opening and his left leg on the other side of the cover. The accident caused him severe pains, loss of wages and permanent injuries, for which he claims $10,000.

After some denials, the claimant alleges:

"Third: On or about the 4th day of March, 1908, the steamtug 'Downer' was engaged by the White Star Line to meet its steamship 'Georgic' in the Upper Bay and take off some men who were on board of her and bring them back to Pier 49, North River. The 'Downer' is a wooden harbor tug, constructed and fitted in the usual and customary manner and was in every respect well and sufficiently manned and equipped for the service upon which she was engaged. On ·her after end, and just forward of her hawser rack, there is a small hatch or opening in her deck, which leads to a locker in her hold. Between this hatch and the after end of the house, there is a large space of clear unobstructed deck, affording an absolutely safe passage for all persons across the vessel from one side to the other. Between the forward end of her house and her bow there is also a large clear unobstructed deck, affording a safe means of passing across the vessel from one side to the other. There was no occasion for any person· on board of the tug, except the crew in the management of their hawser to go near, to the hatch aforesaid.

Fourth: Upon information and belief, in conformity with the employment aforesaid, the steamtug 'Downer' met the steamship 'Georgic' off Robbins Reef, took a number of men on board from her, brought them back and safely landed them at Pier 49, North River. During the performance of these services, as was necessary ·and proper, a portion of her towing hawser was on the hawser rack, and ran thence through the hatchway aforesaid into her locker,

where the balance of it was coiled, and the cover was off the hatch lying on deck. The weather was clear; it was about mid day; the condition of the hatch and hawser was perfectly visible; and, if libellant was on board the tug, and sustained the injuries complained of in the libel, the same were caused through his own gross negligence and carelessness.

Fifth: Upon information and belief, when said men from the 'Georgic' came aboard the 'Downer', they were observed and counted by the master of the tug, and as they went ashore they were also observed and counted by him. No suggestion or claim was made by the libellant at that time, that he had sustained injuries in any manner while on board of the tug and all of them passed from the tug to the dock in apparently the same physical condition as they were when they came on board."

The testimony shows that a gang of carpenters and stevedores were at work on the steamer Georgic, fitting up some cattle pens, when her sailing time came, and in order to complete the work, they remained on the steamer until she was some distance down the bay. The tug Downer was employed by the White Star Line, to which the steamer belonged, to accompany the steamer and take the men off when they were through with the piece of work upon which they were engaged. This occurred when the steamer was in the vicinity of Robbins Reef and the men then went on the tug to be taken back to Pier 49. The libellant and all of the others remained on the deck of the tug, the libellant seating himself on the after towing bitts, facing towards the stern of the boat. He remained there until the tug reached the pier, when in attempting to go ashore, he crossed a hatch, which was partly concealed by its cover. He placed his foot and rested his weight upon the cover, which tilted up, permitting his leg to go into the hole and causing the cover to strike his groin, with the result that he received painful and serious injuries.

The theory on the part of the libellant is that being a passenger, he was entitled to all the care that a passenger is ordinarily entitled to. The difficulty with that contention is that the relation of passenger and carrier has not been established. If the libellant has remained on the Georgic and received injuries there, it would scarcely be urged that he had a passenger's right. He was an employé of the White Star Line, which furnished him with an ordinarily safe place to work and when he was transferred to the Downer, he was still such an employé and was being transported from his work back to New York, also in an ordinarily safe place.

It is said in 5 Cyc. 486 that:

"A passenger, in the legal sense of the term, is one who travels in some public conveyance by virtue of a contract, express or implied, with the carrier, as to payment of fare, or that which is accepted as an equivalent therefor."

There was no suggestion here of a contract of any description to pay a fare of any kind to the tug for the transportation. The tug's general business was that of towage, or work of that character. She was hired by the hour to perform such service of the kind as the White Star Company might require and in the course of this employment, she was directed to transport the libellant and his fellow workmen from the Georgic to the pier. There was no contractual relation between the libellant and the tug. The only contract in which the tug entered was the one mentioned, under which she was directed

by her employer to transfer the men to the pier. It seems quite evident that the libellant was not entitled to the care which should be given to passengers.

It remains to be determined whether there was any negligence on the tug's part which would entitle the libellant to recover damages for the results of his accident.

It appears that the libellant selected his own location on the boat. If he had desired to go within the cabin or any part of the house structure, no doubt, permission could have been obtained upon application to the master, but the libellant did not consider it worth while to make the request and seated himself as has been described. The hatch into which he subsequently fell was within a couple of feet of the bitts. It was partly concealed by the cover which had been placed on it, leaving room, however, for the hawser which ran into the hatch and kept the lid up from 1½ to 2 inches. The members of the crew have testified that they did not put the cover on the hatch and it has been suggested that it must have been done by some of the libellant's co-servants but I do not consider this aspect of the case is of much importance. There was sufficient in the appearance of the hatch as covered to excite the notice and apprehension of an ordinarily observant person. It was evidently the duty of the libellant to look about him and see where he was stepping. Ropes were lying on the after deck and its whole condition showed that it was not a place to be moving around without careful observation. I am unable to see that there was any such failure of duty on the part of those in charge of the tug as would constitute negligence imputable to her. They were pursuing the usual course in the navigation of the tug and the arrangement of the deck, and the libellant was or should have been familiar with it, at least sufficiently so as to cause him to be vigilant, in which event, there would have been no accident. The accident was primarily due to the libellant's own negligence.

The libel is dismissed.